UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

JOSEPH A. CARTAGENA AND SNEAKER
ADDICT TOURING, LLC,

                              Plaintiffs,

       -against-                                    No. 19 Civ. 6287 (CM)

HOMELAND INSURANCE COMPANY
OF NEW YORK,

                              Defendant.
_____x

## DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND GRANTING SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS ON THE ISSUES RAISED BY DEFENDANT

McMahon, C.J.:

       Plaintiffs Joseph A. Cartagena (p/k/a "Fat Joe") ("Cartagena") and Sneaker Addict

Touring, LLC ("Sneaker Addict") bring this insurance coverage action against Defendant

Homeland Insurance Company of New York ("Homeland") arising from the policy Homeland

issued Plaintiffs (the "Policy"). Homeland has refused to provide Plaintiffs with a defense in an

underlying action entitled Elliott v. Cartagena et al., No. 19-cv-1998 (NRB) (the "Elliott

Lawsuit"), presently pending before another judge of this Court. Plaintiffs assert claims for

(i) breach of contract; (ii) breach of the implied covenant of good faith and fair dealing; and

(iii) a declaration that they are entitled to coverage in the Elliott Lawsuit.

       Homeland originally moved to dismiss the complaint for failure to state a claim on two

grounds: (i) the Policy excludes the claim asserted in the Elliott Lawsuit because Elliott was an

independent contractor or joint venturer, and (ii) the various causes of action asserted by Elliott

are not "perils" covered by the Policy. Plaintiffs opposed the motion but did not cross-move for

summary judgment. It quickly became clear to the Court that these issues, which involve nothing more than construction of an unambiguous contract, could be disposed of on summary judgment. Accordingly, on November 25, 2019, I issued an order converting the motion to dismiss to a motion for summary judgment (Fed. R. Civ. P. 12(d)), and invited the Parties to deal with the motion on that basis. (Dkt. No. 20). Plaintiffs and Homeland filed additional papers on December 6, 2019 (Dkt. Nos. 21, 22).

Treating the motion as a motion for summary judgment, Homeland's original motion is granted only as to Count II. The remainder of its motion is denied, and summary judgment is awarded to Plaintiffs on the remaining issues raised by the motion – namely, whether the Elliott Lawsuit alleges "covered perils" and whether Exclusion B applies. Plaintiffs are entitled to judgment as a matter of law on the undisputed facts. The fact that Plaintiffs made no motion is of no moment, since on a motion for summary judgment the Court may enter judgment in favor of any party, including a non-moving party, who is entitled thereto, after giving reasonable notice. Fed. R. Civ. P. 56(f)(1). The Court's notice that the motion was being converted and request for further submissions satisfies the requirements of Rule 56(f).

There remain in the case several other bases for Homeland's denial of coverage. The Parties were ordered to complete discovery on those issues within 90 days.

## BACKGROUND FACTS

*The Policy*

Cartagena is a renowned hip-hop artist professionally known as "Fat Joe," and the sole member of his company, Sneaker Addict. (Compl. ¶ 12, Dkt. No. 1; Dkt. No. 7). Both plaintiffs are citizens of Florida. (Compl. ¶¶ 3–4; Dkt. No. 7).

Homeland is an insurance company with its principal place of business in New York. (Compl. ¶¶ 10–11). On January 18, 2019, Homeland issued Plaintiffs a $1,000,000 claims-made Music Professional Liability Insurance Policy (the "Policy"). Cartagena and Sneaker Addict are both Named Insureds under the Policy. ("Policy" at 4, 17, Dkt. No. 14).

The Policy provides coverage for certain claims brought against the Insureds that arise from their music publishing, producing, recording, songwriting, distributing, licensing, and performing, including specifically: "infringement of copyright, plagiarism, Piracy, and misappropriation of ideas under implied contract or other misappropriation or ideas or information." (*Id.* at 11, 18).

Under Exclusion B, the Policy excludes coverage for claims brought "against the Insureds by any past, present or future Insured, joint venturer or Independent Contractor" who is either (1) seeking compensation, an accounting or recovery of profits or royalties, or (2) claiming an ownership interest in the Insured's music or lyrics. (*See id.* at 20, 21).

When a claim is covered by the Policy, Homeland must defend the underlying lawsuit on behalf of the Insureds and indemnify the Insureds for any judgment or settlement, subject to the limits of liability and retention. (*Id.* at 18–20).

*The Underlying Lawsuit*

Eric A. Elliott (p/k/a Fly Havana) ("Elliott") filed a lawsuit (the "Elliott Lawsuit") against Plaintiffs, among others, in the Southern District of New York in March of 2019 ("Elliott Compl.," Ex. 2 to Def.'s Mot. to Dismiss, Dkt. No. 9-2).

One of Cartagena's hit recordings is "All the Way Up." (Compl. ¶ 13). According to the complaint in the Elliott Lawsuit (the "Elliott Complaint"), Elliott and Shandel Green (p/k/a Infared) ("Green") created an unfinished version of the song "All the Way Up." (Elliott Compl.

¶ 8).  At the time, Elliott "supported the song being shopped to Fat Joe [Cartagena] so it could be further developed and released." (*Id.* ¶ 13).  In the following months, Cartagena and other artists added to the unfinished version to create the final version of the song, which went on to become a double platinum recording.  Elliott allegedly knew none of this.  (*Id.* ¶¶ 9, 34–38).

Elliott claims that he is a joint author and joint owner of the final version.  However, Cartagena, Green, other contributing artists, and various entities are listed as authors on the copyright registrations for the final released versions of "All the Way Up."  (*Id.* ¶¶ 108–09).  The same authors are listed on the song's registrations with BMI and ASCAP, two performing rights organizations.  (*Id.* ¶ 110).  Elliott is not listed as an author on any registration.

When Elliott heard the final version of "All the Way Up" on the radio, he confronted Cartagena and asked why he had not received any credit or compensation for his work.  (*Id.* ¶¶ 38–42).  The two spoke by telephone.  While Cartagena said he "initially thought Elliott had nothing to do with the song," he eventually concluded that Elliott had written and performed on the unfinished version.  (*Id.* ¶¶ 40).  Cartagena allegedly offered to give Elliott "'some bread' up front," more money later, and to work with Elliott in the future.  (*Id.* ¶ 42).

A week or so later, Cartagena met with Elliott, gave him a check for $5,000, and made him sign a contract.  (*Id.* ¶¶ 48–56).  According to Elliott, Cartagena represented that the contract memorialized his offer that Elliott would get some money up front, more money later, and would have an opportunity to work with Cartagena in the future.  (*Id.* ¶ 54).  Elliott now alleges that Cartagena's statements were knowingly false representations.  (*Id.* ¶ 55).

Elliott alleges that he has not received any credit or compensation for his contribution to the song beyond the single $5,000 check.  (*Id.* ¶ 104).

In his lawsuit, Elliott seeks a declaration that he is either the sole author and owner of the composition and sound recording of "All the Way Up," or a joint author and owner with Plaintiffs. (*Id.* ¶¶ 222–86, Counts I-IV). Elliott also brings several state law claims against the defendants, including claims for an accounting, constructive trust, unjust enrichment, quantum meruit, conversion, moneys had and received, breach of fiduciary duties, and negligence/gross negligence. (*Id.* ¶¶ 287–331, Counts V-XII). Finally, Elliott brings several claims for fraud/negligent misrepresentation and civil conspiracy against Cartagena and Green and their related entities (including Sneaker Addict) arising out of their alleged effort to cut Elliott out of his fair share. (*Id.* ¶¶ 332–55, Counts XIII-XIV).

Elliott specifically says that his lawsuit "is not an infringement action," and he does not bring a copyright infringement claim. (*Id.* ¶¶ 3, 222–355). And indeed, his claim of joint authorship would be inconsistent with a copyright infringement claim, since joint authors may not sue one another for infringement. *Weissmann v. Freeman*, 868 F.2d 1313, 1318 (2d Cir. 1989); *Korman v. Iglesias*, 736 F. Supp. 261, 264 (S.D. Fla. 1990).

*Plaintiffs Seek Defense from Homeland Under the Policy*

Cartagena submitted a claim to Homeland under the Policy for coverage for the Elliott Lawsuit. (Compl. ¶¶ 15–17).

Homeland denied Cartagena's claim because (i) the Policy excludes claims brought by an Independent Contractor (Elliott); (ii) the causes of action alleged in the Elliott Lawsuit are not perils covered by the Policy; and (iii) Cartagena allegedly knew before Homeland issued the Policy that Elliott was likely to make a claim, but falsely represented that he was unaware of any situation that could give rise to a claim. (*Id.* ¶¶ 18–19).

At present, Plaintiffs are defending against the Elliott Lawsuit on their own. They filed the instant lawsuit in order to obtain coverage.

## DISCUSSION

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

The Court may grant summary judgment, even for a non-movant, where a party is entitled to judgment as a matter of law on undisputed facts. Fed. R. Civ. P. 56(f)(1). [1]

**Choice of Law**

The Policy does not contain a choice of law provision. Plaintiffs assert that New York law controls. Homeland urges that Florida law governs.

Although courts sometimes decline to make a choice of law determination without any jurisdictional discovery, the relevant facts in this case are clear enough to permit the choice of law decision now. *See Patel v. New York Life Ins. Co.*, No. 11-cv-4895, 2012 WL 1883529, at *3 (S.D.N.Y. May 21, 2012). Florida law applies to this contractual dispute.

A federal court sitting in diversity must apply the choice of law rules of the forum state. *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018); *see Klaxon Co. v.*

---

[1] In this case, Plaintiffs did not attach the Elliott Complaint or the Policy to their complaint. (*See* Dkt. No. 1). The Court will consider these documents as provided by Homeland because Plaintiffs quoted and relied on these documents, they are central to the dispute, and Homeland's motion has been converted to a motion for summary judgment. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002); *M.T. v. City of New York*, 325 F. Supp. 3d 487, 497 (S.D.N.Y. 2018).

*Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). Under New York's choice-of-law analysis, the first step is to determine whether there is an actual conflict between the laws of the several states that might apply. *Jimenez v. Monadnock Constr., Inc.*, 109 A.D.3d 514, 516 (N.Y. 2d Dep't 2013) (quoting *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993)).

There is a meaningful difference between an insurer's duty to defend under New York and Florida law.

In New York, "the duty of an insurer to defend arises whenever the allegations within the four corners of the underlying complaint potentially give rise to a covered claim, *or* where the insurer has actual knowledge of facts establishing a reasonable possibility of coverage." *Feldman Law Grp. P.C. v. Liberty Mut. Ins. Co.*, 819 F. Supp. 2d 247, 256 (S.D.N.Y. 2011) (emphasis in original) (internal quotation and citations omitted), *aff'd*, 476 F. App'x 913 (2d Cir. 2012).

By contrast, in Florida, "the insurer's duty to defend is based *solely* on the allegations in the complaint." *Underwriters at Lloyds London v. STD Enters., Inc.*, 395 F. Supp. 2d 1142, 1145 (M.D. Fla. 2005) (emphasis added) (citing *Lime Tree Vill. Cmty. Club Ass'n, Inc. v. State Farm Gen. Ins. Co.*, 980 F.2d 1402, 1405 (11th Cir. 1993)).

Because the duty to defend under Florida law is limited by the complaint, while New York would consider the insurer's extrinsic knowledge in addition to the allegations in the pleading, a formal choice-of-law analysis is necessary. *See Feldman*, 819 F. Supp. 2d at 256–57.

Where an actual conflict exists, New York applies the "center of gravity" or "grouping of contracts" theory. *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*, 36 A.D.3d 17, 21 (N.Y. 1st Dep't 2006), *aff'd*, 9 N.Y.3d 928 (2007).

In the context of a liability insurance policy, the governing law is "the state which the parties understood to be the principal location of the insured risk . . . unless with respect to the particular issue, some other state has a more significant relationship . . . to the transaction and the parties." *Id.* at 21–22 (ellipses in original) (internal citations omitted).

Where the insured risk is scattered throughout multiple states, New York courts deem the risk to be located principally in the state of the insured's domicile at the time the policy was issued. *Id.* at 24; *see also Jimenez*, 109 A.D.3d at 517.

Sneaker Addict is a citizen, resident, and domiciliary of Florida. (Compl. ¶ 4). Cartagena, Sneaker Addict's sole member, "is, and at all relevant times was, a renowned hip-hop artist who resides in Miami, Florida." (*Id.* ¶ 8). The Policy was registered and delivered under Florida law. (*Id.* ¶ 11). Therefore, Florida is the state where the risk is principally located, and Florida law applies.

In their opposition papers, Plaintiffs quibble that Homeland failed to establish the domicile of Plaintiffs at the time the Policy was issued because the redacted version of the Policy that was attached to Homeland's motion to dismiss did not note the address of the Named Insureds. However, Homeland subsequently submitted an unredacted version of the Policy; it lists the Named Insureds' address in Miami, Florida. (*See* Policy at 4; *compare* Ex. 2 to Def.'s Mot. to Dismiss, Dkt. No. 9-3, *with* Def.'s Resp. to Mot., Dkt. No 14).

It is true that Homeland is based in New York and the Elliott Lawsuit is pending in this district. However, the place where the underlying lawsuit is located is not sufficient to outweigh an insured's domicile in a New York choice of law analysis. *See Feldman*, 819 F. Supp. 2d at 257. Therefore, Florida law governs this coverage dispute.

**I. Homeland's Motion to Dismiss Count I Breach of Insurance Contract is Denied.**

Homeland asserts that Plaintiffs fail to state a claim for breach of insurance contract because the Policy does not afford coverage for the Elliott Lawsuit. Homeland is wrong.

**The allegations in the Elliott Complaint trigger coverage under several "perils" identified in the Policy.**

Under Florida law, an insurer's duty to defend "arises from the 'eight corners'" of the underlying complaint and the insurance policy. *Scott, Blane, & Darren Recovery, LLC v. Auto-Owners Ins. Co.*, 727 F. App'x 625, 631 (11th Cir. 2018) (internal citations omitted). The court compares the policy to "the facts and legal theories alleged in the pleadings and claims against the insured." *Id.* The duty to defend is not determined by the "true facts of the cause of action against the insured, the insured's version of the facts or the insured's defenses." *Trailer Bridge, Inc. v. Illinois Nat. Ins. Co.*, 657 F.3d 1135, 1141 (11th Cir. 2011) (internal citations omitted). "The insurer must defend when the [underlying] complaint alleges facts which fairly and potentially bring the suit within policy coverage." *Lime Tree Vill.*, 980 F.2d at 1405 (internal citations omitted).

Florida law gives the insured the benefit of the doubt in the construction of both the policy and the underlying complaint. Florida courts must "construe the terms of the [insured]'s policy based on their plain meaning, resolving any ambiguities in favor of the insured." *Pub. Risk Mgmt. of Fla. v. One Beacon Ins. Co.*, 569 F. App'x 865, 869 (11th Cir. 2014) (internal citations omitted). If a term is ambiguous, it is construed "liberally in favor of the insured and strictly against the insurer." *Hartford Acc. & Indem. Co. v. Beaver*, 466 F.3d 1289, 1296 (11th Cir. 2006) (internal citations omitted). With respect to the underlying complaint, if the allegations "leave any doubt as to the duty to defend, the question must be resolved in favor of the insured." *Lime Tree Vill.*, 980 F.2d at 1405. Where the underlying complaint "alleges facts

partially within and partially outside the scope of coverage, the insurer is obligated to defend the entire suit." *Trizec Props., Inc. v. Biltmore Constr. Co.*, 767 F.2d 810, 811–12 (11th Cir. 1985).

The Policy covers: "infringement of copyright, plagiarism, Piracy, and misappropriation of ideas under implied contract or other misappropriation or ideas or information." (Policy at 18). The Policy defines "Piracy," but the other terms, not defined by the Policy, must be given their plain meaning and "read in light of the skill and experience of ordinary people." *Scott, Blane, & Darren*, 727 F. App'x at 631 (internal citation omitted).

The Elliott Complaint by its terms does not allege copyright infringement. However, the words in the four corners of the Elliott Complaint fairly allege Piracy, plagiarism, and misappropriation of ideas or information. Therefore, the subject matter of the lawsuit falls within the scope of the duty to defend.

*The Elliott Complaint fairly alleges "Piracy."*

In the Policy, "Piracy" is defined as "the wrongful use, reprinting or reproduction of copyrighted intellectual property." (Policy at 21). Elliott fairly alleges that the defendants in his lawsuit (Plaintiffs here) wrongfully used his copyrighted intellectual property.

Federal copyright attaches to any work of original authorship as soon as it is fixed in any medium; registration, while a necessary precondition to suit, is not what confers copyright protection on a work. 17 U.S.C. § 102; *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 887 (2019). Elliott alleges that he and Green "left [the recording studio] with a copy of the unfinished song on the CD," (Elliott Compl. ¶ 32) – their work (the unfinished version of the song) was fixed in a medium (the CD). Elliott therefore holds a copyright in that primitive version of the work (although in the absence of registration, he could

not sue to protect his copyright).  On the facts alleged in the Elliott Complaint, Elliott could

claim "Piracy" as that term is defined in the Policy.

Homeland argues that the Elliott Complaint does not allege that Cartagena "wrongfully"

used the unfinished version because Elliott wanted Cartagena to use and take credit for the song.

Homeland is wrong.

Although the Elliott Complaint alleges that Elliott supported shopping the song to

Cartagena and that all of the song's authors intended to create a joint work, it also alleges

multiple instances of Cartagena's wrongful behavior: Cartagena "used and took credit for

[Elliott]'s contributions," (Elliott Compl. ¶ 1); Cartagena "lull[ed] Mr. Elliott into a false sense

of security" with "knowingly false and/or highly misleading" statements, (*id.* ¶ 42); Cartagena

was "pressuring and defrauding [Elliott], because he saw a problem he could fix by taking

advantage of [Elliott]," (*id.* ¶ 47); Cartagena "told [Elliott] a series of lies calculated to deceive

[Elliott], designed to relax his vigilance, and lull him into a false sense of security . . . solely for

[Cartagena's, Green's,] and the other Defendants' gain – to [Elliott]'s detriment," (*id.* ¶ 58); and

Cartagena's "true goal was to instead take [Elliott]'s credit, money, and ownership for

himself . . ." (*id.* ¶ 63).  Plainly, the Elliott Complaint sounds in "Piracy" for Cartagena's

"wrongful use" of Elliott's "copyrighted intellectual property."

*The Elliott Complaint fairly alleges plagiarism.*

Every student who has written a research paper knows to cite the sources she uses, lest

risk a failing grade for plagiarism.  Ordinary people understand plagiarism to mean the use of

another's work without proper accreditation.  *See Plagiarize*, MERRIAM-WEBSTER,

https://www.merriam-webster.com/dictionary/plagiarizing (2019) ("to steal and pass off (the

ideas or words of another) as one's own; use (another's production) without crediting the

11

source"). Black's Law Dictionary defines plagiarism as "The deliberate and knowing presentation of another person's original ideas or creative expressions as one's own; the wrongful appropriation of another's expression of ideas, or of the ideas themselves, by slight variation of expression." PLAGIARISM, Black's Law Dictionary (11th ed. 2019).

The Elliott Complaint alleges facts "which fairly and potentially bring the suit within policy coverage" for plagiarism. *See Lime Tree Vill.*, 980 F.2d at 1405. The gravamen of the Elliott Complaint is that "Defendants Fat Joe [Cartagena] . . . and others used and took credit for [Elliott]'s contributions to the 2016 double platinum single 'All the Way Up' without providing him his required credit, compensation, and ownership." (Elliott Compl. ¶ 1). These allegations – that Cartagena and others have passed off "All the Way Up" as their own without crediting Elliott – can be fairly read as plagiarism.

Homeland, noting that a joint owner cannot be held liable for copyright infringement to a fellow joint owner, argues – by extension and without citation to any authority – that if Cartagena is a co-author and co-owner of "All the Way Up," then he could not have plagiarized or misappropriated Elliott's work. This argument fails.

The Policy clearly recognizes plagiarism as distinct from copyright infringement, because it lists these perils separately. Any other reading would fail to give the covered peril of plagiarism any operative effect. *Pub. Risk Mgmt.*, 569 F. App'x at 870 (quoting *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007)). Black's Law Dictionary notes this distinction between infringement and plagiarism: "If the expression's creator gives unrestricted permission for its use and the user claims the expression as original, the user commits plagiarism but does not violate copyright laws." PLAGIARISM, Black's Law Dictionary (11th ed. 2019). Elliott's allegations fit fairly within Black's example: even if Elliott gave Cartagena unrestricted

permission to use his contributions, Cartagena has claimed the finished song as his own without crediting Elliott.

*The Elliott Complaint fairly alleges misappropriation.*

Similarly, the Elliott Complaint alleges facts that, if proved, would establish that Cartagena misappropriated ideas presented to him by Elliott. Black's Law Dictionary defines "misappropriation" as: "The application of another's property or money dishonestly to one's own use. . . . or copying a work whose creator has not yet claimed or been granted exclusive rights in the work." MISAPPROPRIATION, Black's Law Dictionary (11th ed. 2019). It notes that misappropriation applies "to a variety of situations in which the courts have sensed that one party was dealing 'unfairly' with another, but which were not covered by the three established statutory systems protecting intellectual property: copyright, patent, and trademark/deception as to origin." *Id.*

The allegations detailed above fit this description. There would, of course, be questions of fact about whether Elliott was compensated for these ideas, and so suffered no injury. But the underlying facts suggest misappropriation as one possible type of claim.

Homeland's argument to the contrary based on Elliott's allegations of joint ownership fails for the same reasons stated above. Like plagiarism, the Policy clearly recognizes "misappropriation of ideas or information" as distinct from the other separately-listed perils.

Resolving any doubts in favor of the insured, as I must, the allegations in the Elliott Complaint can be fairly read to trigger Homeland's duty to defend Plaintiffs under the covered "Piracy," "plagiarism," and "misappropriation of ideas" perils.

**Exclusion B does not preclude coverage for the Elliott Lawsuit.**

Homeland next argues that, even if the Elliott Lawsuit does allege a covered peril, coverage is precluded by virtue of Exclusion B.

Not so.

Under Florida law, "exclusionary clauses are construed even more strictly against the insurer than coverage clauses." *Pub. Risk Mgmt.*, 569 F. App'x at 872 (quoting *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)). The insurer bears "the burden of demonstrating that the allegations of the complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation." *Id.* (quoting *Hartford Acc.*, 466 at 1296).

Exclusion B of the Policy excludes coverage for claims "against the Insured by any past, present or future Insured, joint venturer or Independent Contractor seeking compensation, an accounting or recovery of profits or royalties or claiming an ownership interest in the Insured's Work[2]." (Policy at 21). Obviously, Elliott is "claiming an ownership interest in the Insured's Work" and seeks "an accounting" and a share of the royalties. Such perils are not covered if – and only if – such a claim is brought by "any past, present or future Insured, joint venturer or Independent Contractor."

Homeland argues that Elliott was either an Independent Contractor or a joint venturer, so Exclusion B removes his claims from the ambit of the Policy.

Homeland is wrong.

_____

[2] The "Insured's Work" means "the music or lyrics created, recorded, printed, distributed or licensed by the Insured . . . ." (Policy at 20).

*Elliott was not an "Independent Contractor."*

Homeland argues that Elliott was an "Independent Contractor" when he provided the preliminary song to Cartagena, pursuant to both express and implied contracts. But he was not.

The Policy defines "Independent Contractor" as "an individual or business entity providing goods or services to the Insured pursuant to an express or implied contract or agreement and relating to the Insured's Work." (*Id.* at 20). No allegation in the Elliott Complaint suggests that Elliott provided his contributions to the unfinished version of the song pursuant to any agreement with Cartagena.

Elliott certainly did not provide his song to Cartagena pursuant to any express agreement. Elliott specifically alleges, "Prior to the creation to 'All the Way Up,' [Elliott] was never part of any agreement or contract which governed the apportionment of authorship in the composition." (Elliott Compl. ¶ 233). After he and Green completed the unfinished version of the song, Green "went radio silent" on Elliott. Several months later, Elliott first heard the finished version of "All the Way Up" on the radio. (*Id.* ¶¶ 34–38).

Homeland relies on the phone calls and meeting between Cartagena and Elliott that occurred *after* the final version of the song was released to support its claim that Elliott was an independent contractor. But that dog won't hunt. Elliott's services could not have been provided to Cartagena *pursuant to* promises that Cartagena made months after Elliott created and shopped the unfinished version of the song to Cartagena.

Homeland urges the Court to disregard the issue of the timing of any purported agreement between Cartagena and Elliott because Exclusion B applies to "any past, present or future . . . Independent Contractor." But that misconstrues the language of the exclusion. If Elliott did not provide his services "pursuant to an express or implied contract or agreement," he

does not satisfy the Policy's definition of an Independent Contractor at all – past, present, or future. The fair implication of providing services pursuant to an agreement is that the agreement is already in existence.

Elliott did not provide his services pursuant to any implied agreement either.

Homeland points to the Elliott Complaint's allegations that "all authors of the composition [including Cartagena] intended to be joint authors," (*id.* ¶ 226), and Elliott "supported the song being shopped to Fat Joe [Cartagena] so it could be further developed and released," (*id.* ¶ 13).  This, Homeland argues, shows an implied agreement between Elliott and Cartagena, based on their mutual intent to be joint authors, pursuant to which Elliott provided services to Cartagena.

Homeland's argument is unpersuasive.  Co-authors of a joint work are not contractual counterparties, but rather "stand in a similar position to 'tenants in common.'"  *Korman*, 736 F. Supp. at 264, *supra*, (quoting *Cmty. for Creative Non-Violence v. Reid*, 846 F.2d 1485, 1498 (D.C. Cir. 1988), *aff'd on other grds.*, 490 U.S. 730 (1989)).  Elliott acknowledges as much by seeking his fair share under the default copyright authorship rules – which apply only in the *absence* of an agreement.  *See* 17 U.S.C. § 201; *Korman*, 736 F. Supp. at 264; (Elliott Compl. ¶ 115).  Taking the Elliott Complaint as pleaded, there is no possibility of an implied contract pursuant to which Elliott provided the unfinished version to Cartagena.

Finally, even if there were a way to read the Elliott Complaint to aver (or suggest) the existence of an implied agreement, Homeland ignores legal theories and allegations that prevent the Elliott Complaint from falling *solely* and *entirely* within the Policy's exclusion for an Independent Contractor.  *See Pub. Risk Mgmt.*, 569 F. App'x at 872 (quoting *Hartford Acc.*, 466 at 1296). In Counts I, II, III and IV, Elliott alternatively seeks declarations that he is an author

and owner of his contributions to the song, rather than a joint author or owner. (Elliott Compl. ¶¶ 232, 248, 265, 281). Additionally, the following allegations refute any shared mutual intent by claiming that Cartagena never intended to credit or compensate Elliott: Cartagena "never intended to fully compensate [Elliott], credit him, and work with [Elliott]," and Cartagena's "intent was at all times to take [Elliott]'s credit and share of the compensation." (*Id.* ¶ 120). Homeland has, therefore, failed to carry its burden that coverage for the Elliott Lawsuit is completely precluded by either an express or an implied agreement.

*Elliott was not a joint venturer.*

Homeland's argument that Elliott was a joint venturer also fails.

The Policy does not define "joint venturer." Homeland urges two dictionary definitions of "joint venture" – a commercial enterprise undertaken jointly, and a business activity two or more people work on together. (Def.'s Mem. at 14–15, Dkt. No. 9-4). Black's Law Dictionary defines a joint venture as "a business undertaking by two or more persons engaged in a single defined project" that requires "(1) an express or implied agreement; (2) a common purpose that the group intends to carry out; (3) shared profits and losses; and (4) each member's equal voice in controlling the project." JOINT VENTURE, Black's Law Dictionary (11th ed. 2019).

As explained above, the Elliott Complaint alleges that Elliott wrote and recorded the unfinished version of the song, and Cartagena used it to create a platinum record (not knowing Elliott had anything to do with it) without any intention to credit or compensate Elliott. Such exploitation does not comport with an ordinary person's understanding of a joint venture. As the legal definition makes clear, without some kind of agreement and equality of interests, there is no joint venture.

As explained in the discussion above, at least some of the allegations and legal theories contained in the four corners of the Elliott Complaint fall within the four corners of the Policy. Homeland has failed to establish that they fall solely and exclusively within Exclusion B. Accordingly, the Policy provides coverage for the Elliott Lawsuit and Homeland had a duty to defend. Plaintiffs have sufficiently alleged Homeland neglected this duty. Homeland's motion to dismiss Count I for breach of contract is therefore denied. Moreover, to the extent that Homeland relies on those theories discussed above, Plaintiffs are entitled to summary judgment declaring that those arguments do not preclude coverage.

**II.    Homeland's Motion to Dismiss Count II Breach of Implied Covenant of Good Faith and Fair Dealing is Granted Without Prejudice.**

Homeland also moves for dismissal of Count II, arguing: (i) Florida common law does not recognize Plaintiffs' claim and (ii) Homeland correctly denied coverage. Homeland is wrong on both counts. However, because Plaintiffs' claim has been asserted prematurely, I will dismiss Count II without prejudice.

Plaintiffs' claim is functionally a common law third-party "bad faith" claim because the Florida Supreme Court has recognized that the duty of good faith and fair dealing is subsumed by so-called "bad faith" actions. *See QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So. 3d 541, 548–49 (Fla. 2012). Homeland argues that because Plaintiffs have not (and do not allege that they have) satisfied the procedural requirements of Florida's bad faith statute, Fla. Stat. § 624.155, their claim must be dismissed. This argument is wrong.

Homeland incorrectly casts Plaintiffs' claim as a first-party bad faith action (bad faith in handling an injured insured's first-party claim). *See Allstate Indem. Co. v. Ruiz*, 899 So. 2d 1121, 1125–26 (Fla. 2005). Rather, Plaintiffs' claim is a third-party action for bad faith in handling a claim brought by an injured third party (here, Elliott) against the insured. *See id.*

"Unlike a first-party bad faith action, which *must* be brought under the statute, a third-party bad faith action can be pursued under both the common law and the statute." *Macola v. Gov't Emps. Ins. Co.*, 953 So. 2d 451, 457 (Fla. 2006) (emphasis added). Moreover, because the plain language the statute states that it "does not preempt any other remedy or cause of action provided for pursuant to . . . the common law of this state," Fla. Stat. § 624.155(8), failure to abide by all of the statutory procedural requirements does not necessarily preclude a common law third-party bad faith claim. *Macola*, 953 So. 2d at 457–58.

However, under Florida law, the "essence" of a bad faith action "is that the insurer breached its duty to its insured by failing to properly or promptly defend the claim . . . all of which results in the insured being exposed to an excess judgment." *Wachovia Ins. Servs., Inc. v. Toomey*, 994 So. 2d 980, 989 (Fla. 2008) (ellipses in original). It follows that a bad faith action "does not accrue until: (1) there is a determination that coverage exists; *and* (2) . . . the third-party obtains a final judgment in excess of policy limits." *Cont'l Cas. Co. v. City of Jacksonville*, 550 F. Supp. 2d 1312, 1338 (M.D. Fla. 2007) (emphasis added), *aff'd*, 283 F. App'x 686 (11th Cir. 2008). There has not yet been a final coverage determination, and the Elliott Lawsuit has not yet been resolved by a judgment in excess of policy limits. Accordingly, Count II is dismissed, but without prejudice to its being asserted if and when it ripens.

Some federal courts have continued to recognize a distinct cause of action for breach of the implied covenant of good faith and fair dealing in insurance contracts – much to the chagrin of the Florida Supreme Court. *See Chalfonte*, 94 So. 3d at 548 (criticizing *Townhouses of Highland Beach Condo. Ass'n, Inc. v. QBE Ins. Corp.*, 504 F. Supp. 2d 1307, 1310 (S.D. Fla. 2007)). Nevertheless, "a claim for breach of the implied duty may be dismissed as redundant where the conduct allegedly violating the implied covenant is duplicative of the companion

cause of action alleging breach of contract." *Amica Mut. Ins. Co. v. Morowitz*, 613 F. Supp. 2d 1358, 1362 (S.D. Fla. 2009) (internal citation omitted). Plaintiffs' "bad faith" claim is based on the same allegations as its breach of contract claim – Homeland's refusal to defend Plaintiffs in the Elliott Lawsuit. Even if I were to recognize an independent claim for breach of the implied covenant of good faith and fair dealing, it would be dismissed as duplicative.

### III. Homeland's Motion to Dismiss Count III for Declaratory Relief is Denied.

Homeland urges this Court to dismiss Plaintiffs' claim for declaratory relief under Rule 12(b)(6) because the Policy does not provide coverage for the Elliott Lawsuit. To the contrary, and as explained above, Plaintiffs have sufficiently pleaded that the Policy covers the perils alleged in the Elliott Lawsuit. Homeland has not argued all the bases for its denial of coverage, but as to those that are the subject of its motion, it is Plaintiffs, not Homeland, that would be entitled to partial judgment on Count III. Accordingly, Homeland's motion to dismiss Count III is denied. *See Inmate Calling Sols., LLC v. Chubb Grp. of Ins. Companies*, No. 6:17-cv-1258, 2018 WL 3827672, at *3–4 (M.D. Fla. Mar. 12, 2018).

### CONCLUSION

For the reasons stated above, Homeland's motion to dismiss the complaint is denied as to Counts I and III, and granted, without prejudice, as to Count II. Summary judgment is awarded to Plaintiffs on the issues raised by the motion regarding Counts I and III: with respect to Homeland's duty to defend the Elliott Lawsuit, the Elliott Complaint alleges "covered perils" and Exclusion B does not apply. The Clerk of Court is respectfully directed to terminate the open motions at Dkt. Nos. 9, 21, and 22.

Dated: December 16, 2019
New York, New York

Chief Judge

BY ECF TO ALL PARTIES

21